IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CT-03240-M-RJ

MIGUEL ANTONIO MEZA-RODRIGUEZ,   )
         )
     Plaintiff,         )
         )
    v.         )       ORDER
         )
CHARLOTTE EVANS, et al.,      )
         )
     Defendants.      )

On August 23, 2023, Miguel Antonio Meza-Rodriguez ("plaintiff"), a state inmate proceeding without prepayment of fees, filed *pro se* a complaint under 42 U.S.C. § 1983. See [D.E. 1, 2, 7]. Plaintiff also moved to appoint counsel. See Mot. [D.E. 4]. Plaintiff later filed a motion seeking copies and leave to file an amended complaint. See Mot. [D.E. 10].

On February 7, 2024, the court denied plaintiff's motion to appoint counsel, granted in part the motion for leave to amend, directed plaintiff to file one amended complaint, and denied the motion to the extent plaintiff sought free copies. See Order [D.E. 12].

On February 20, 2024, plaintiff filed his amended complaint. Am. Compl. [D.E. 13].

On May 7, 2024, plaintiff moved for reconsideration of the court's denial of his motion to appoint counsel. See Mot. [D.E. 14] (arguing there are exceptional circumstances meriting appointment of counsel because he is being tested for an autoimmune condition).

"Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment[,]" but instead are "committed to the discretion of the district court." American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514–15 (4th Cir. 2003). A court may revise an interlocutory order under the following three

circumstances: (1) a subsequent trial produces substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice. See Carlson v. Boston Scientific Corp., 856 F.3d 320, 325 (4th Cir. 2017).

The court's prior order found that this case is not complex, and that plaintiff has the capacity to proceed *pro se*. See Order [D.E. 12]. Plaintiff's purported autoimmune condition is not an "exceptional circumstance" meriting appointment of counsel. Cf. Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984). Thus, the court DENIES this motion for reconsideration.

Pursuant to 28 U.S.C. § 1915A, the court now conducts its initial review of plaintiff's amended complaint and, for the following reasons, allows the action to proceed in part.

### Legal Standard:

When a prisoner seeks relief in a civil action from a governmental entity or officer, a court must dismiss the complaint if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(a), (b)(1). A frivolous case "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). Legally frivolous claims are "based on an indisputably meritless legal theory and include claims of infringement of a legal interest which clearly does not exist." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (quotations omitted). Factually frivolous claims lack an "arguable basis" in fact. Neitzke, 490 U.S. at 325.

The standard used to evaluate the sufficiency of a pleading is flexible, and a *pro se* complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted). A *pro se* plaintiff's pleading, however, must contain "more than labels and conclusions," see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Giarratano v. Johnson,

2

521 F.3d 298, 304 n.5 (4th Cir. 2008), and the court need not accept as true any legal conclusions

or unwarranted factual inferences, see Ashcroft v. Iqbal, 556 U.S. 662, 677–83 (2009); Coleman

v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012).

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988);

Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Further, a plaintiff also

"must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." Iqbal, 556 U.S. at 676; see Monell v. Dep't of Soc. Servs.,

436 U.S. 658, 691–92 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

Plaintiff's Amended Complaint:

Plaintiff generally alleges deliberate indifference to his serious medical needs and failure

to process sick calls, in violation of the Eighth Amendment, and "failure to fully investigate [his]

grievance," in violation of the Fourteenth Amendment, at Bertie C.I. Gray and Blue Units from

January 13, 2022, and January 8, 2024. Am. Compl. [D.E. 13] at 8. He names as defendants:

Dr. Charlotte Evans ("Dr. Evans"); Nursing Supervisor Pierre ("Pierre"); Unit Manager Mashell

Wilson ("Wilson"); Associate Warden Demetrius Clark ("Clark"); Medical Technician Nurse

Griswell ("Griswell"); Nurse Lowry ("Lowrey"); Case Manager Bond ("Bond"); Practitioner

Assistant [sic] Ruby Ford ("Ford"); Unit Manager Michael Parker ("Parker"); and Case Manager

Sean T. Dillard ("Dillard") (collectively, "defendants"). Id. at 2–7.

Plaintiff specifically alleges that: circa January 13, 2022, he submitted a sick call about "a

ball [sic] that appeared on the left side of [his] lower back" that causes him back pain and pain and

3

numbness in his left thigh and leg. Id. at 8. Months went by without him being seen by medical and, when he asked about the delay, "they all kept saying that they were 'backed up.'" Id.

On March 4, 2022, plaintiff asked Nurse Brake if he should put in another sick call, the nurse checked the computer, and informed him the sick call from January was still pending and she did not know why he had not yet been scheduled to be seen. Id.

On April 28, 2022, plaintiff was seen by an unnamed nurse who "saw that [he] did have a ball [sic] on [his] lower back, and she referred [him] to be seen by the doctor." Id.

On May 3, 2022, plaintiff declared a medical emergency because he "started coughing up blood mixed with black stuff," but an unnamed doctor said it was not a medical emergency. Id. Sergeant Watson told him, "they said for [him] to put in a sick call[.] [Watson] told them about [his] issue but they never came to get [him]. [He] turned in a sick call on May 4, 2022." Id.

Circa June 10, 2022, plaintiff was housed in Gray Unit, "E" block, cell 14. Id. Two officers and Dr. Evans came to his door and told him that he "was not going to be seen about the ball on [his] back because they were not going to pull [him] out of [his] cell." Id. at 8–9. Plaintiff tried to explain to Dr. Evans that he "had been waiting to be seen for six months but she held her open palm up to [his] window and refused to hear what [he] had to say." Id. at 9. Dr. Evans then "turned around away from [plaintiff] and told the officers 'let's go[,]' and they exited the block." Id. Dr. Evans "didn't explain why [plaintiff] was being denied treatment, and she didn't say anything else about the other sick calls regarding [plaintiff] coughing up blood mixed with black stuff either." Id. Plaintiff continued submitting sick calls, asking the nurses about them, and tried to talk to Dr. Evans on several occasions when she came into the cellblock to talk to other inmates, but Dr. Evans refused to talk to him. Id.

4

Circa the end of June or in July 2022, plaintiff transferred to the "G" cellblock in the Gray Unit and was asked if he "wanted to come out for a screening," and he said, "yes." Id. Nurse Supervisor Pierre checked his vitals, and he asked her "if this was about the sick calls [he] had put in back in January 2022 or the ones [he] had put [in] after that?" Id. Pierre said, "No, this is just a regular screening that is done when any offender is brought to lock up." Id. He informed her that he had been on lock up for over a year and a half, and Pierre said, "Oh, we're done then, for some reason it showed me that you had just gotten locked up." Id. He asked about the sick calls and Pierre "said they were backed up." Id. Pierre "is in charge of processing the sick calls[,] but she didn't do anything about the ones [plaintiff] had submitted and didn't even look up in the computer to check on them[.] [Pierre] just said, 'we're backed up.'" Id.

On August 8, 2023, plaintiff submitted a grievance to Sergeant Riddick "regarding medical staff and Doctor Evans' refusal to provide [him] medical attention." Id. Riddick took the grievance, gave plaintiff a copy, and put the grievance in the Unit Manager's box. Id. About two weeks later, plaintiff had not heard anything about the grievance. Id. He asked Unit Manager Wilson who said she had not received it. Id. Plaintiff asked Wilson to ask Riddick about it. Id. A few days later, Riddick and Wilson came into the block together, Riddick confirmed that plaintiff had given him a grievance on August 8, 2022, and, after Riddick left, "Unit Manager Wilson stated that it was probably a lie and that 'they' had probably threw the grievance away [sic]." Id. at 9–10. Wilson also told plaintiff that Wilson "had spoken to Associate Warden Mr. Clark about the grievance regarding [plaintiff's] situation with medical" and that Clark "was aware of the situation and was going to see what he could do." Id. at 10. Plaintiff never heard anything else about the grievance, and neither Wilson nor Clark "did anything to get

5

medical to see [him]," as Wilson told him they were "in charge of 'custody' not 'medical.'" Id.
At times, plaintiff has witnessed Wilson and Clark requesting that a nurse see an inmate. Id.

Circa August 22, 2022, plaintiff spoke to Case Manager Bond about the sick calls and the grievance he submitted on August 8, 2022, "and how they all ended up disappearing." Id. Bond told him to fill out another sick call request, give it to Bond, and Bond would personally turn it in. Id. Plaintiff did so, and Bond turned it in, but this request "also disappeared, it was thrown away, it was not processed." Id. Plaintiff kept on submitting sick calls throughout the year. Id.

"On January 1," presumably in 2023, Nurse Woodard asked if plaintiff wanted to come for a screening. Id. He asked if the screening had to do with his sick call requests, and Woodard told him there were no sick call requests pending and it was a "regular" screening. Id. He declined to be seen by Nurse Woodard, kept submitting sick calls, asked the nurses about them, but "nobody would tell [him] anything." Id.

"In early May 2023," plaintiff spoke to Unit Manager Wilson about a sick call he had submitted on April 3, 2023, Wilson told him she would ask the nurses about it, and later told him "they were 'looking into it,' that they were going to get back to [plaintiff]. They never did." Id.

On May 6, 2023, plaintiff told Unit Manager Wilson that medical had not gotten back to him yet, and Wilson told plaintiff to "write a grievance." Id.

On May 10, 2023, plaintiff spoke to Nurse Lowry who asked him what the sick calls were about. Id. Plaintiff mentioned his back and chest pain, spitting up black stuff mixed with blood, and pain and numbness in his left thigh. Id. at 10–11. Lowry wrote down this information "on her hand" and told plaintiff she would not forget, but "she never came back." Id. at 11.

6

On May 14, 2023, plaintiff filled out a grievance that he submitted to Unit Manager Wilson on May 15, 2023. Id. As he was turning in this grievance, plaintiff asked to speak to defendant Ford who was attending to another inmate. Id. Plaintiff "told Ford everything [he] stated on this complaint, about all the sick calls and about how [his] back, [his] chest, and [his] left thigh was hurting so bad, and that sometimes when [he] coughed [he] would spit blood mixed with black phlegm." Wilson "told [Ford] that 'yes[,] it is true, he has been trying to get medical attention for over a year.'" Id. Ford wrote down plaintiff's info and said she would check and get back to plaintiff, but Ford refused to disclose her name and "never came back." Id.

On June 1, 2023, plaintiff filled out a sick call "about the same issues as the ones before and [he] was called to [his] case manager's office." Id. After plaintiff "was done doing what she called [him] out for [sic], [he] gave her the sick call to turn it in for [him]," and saw his case manager "deposit the sick call into the sick calls box." Id. On his way back to the block, plaintiff stopped by the nurse station and asked Nurse Hudges to see if there were any sick calls pending. Id. He told her he just turned one into his case manager who deposited it in the box. Id. Nurse Hudges told plaintiff "she couldn't see [him] until they processed the sick call." Id.

On June 6, 2023, plaintiff was called to see the nurse, saw Nurse Hudges, and asked if this was about the sick call. Id. Nurse Hudges said, "No, it is about the grievance you turned in," and referred plaintiff to be seen by Ford. Id.

On June 16, 2023, plaintiff was seen by Ford who asked plaintiff about his medical issues. Id. at 12. Plaintiff told Ford "once again" about his back pain, chest pain, the pain and numbness in his left thigh and leg, and the "ball on [his] lower back." Id. Plaintiff also told Ford how Dr. Evans had refused to see him. Id. Ford "looked at the computer and corroborated everything,"

7

telling plaintiff "I don't understand why she acted that way," and that Dr. Evans "wrote a comment in the computer on 6-10-22 [that] she had seen you through the cell window but didn't say anything else other than that, and she just increased the dosis [sic] of Vitamin D from 1000 units to 5000 units, but that's unrelated. So[,] I know you are telling the truth." Id. As to why it took Ford 32 days to see plaintiff since he spoke to Ford on May 15, 2023, Ford said "she was going to get around to do it [but] that she hadn't had the chance." Id. Ford ordered X-rays and lab work and discussed plaintiff being "taken off the soy milk [sic]" despite being lactose intolerant. Id. Ford told plaintiff she was going to recommend that he again receive soy milk, but she didn't do so; instead, Ford prescribed omeprazole/Prilosec for heart burn. Id.

On June 21, 2023, plaintiff was called to main medical for chest and back X-rays. Id. Nursing Supervisor Pierre approached his holding cell and told him, "next time you want to be seen by medical, put in a sick call." Id. Plaintiff said that he had submitted a bunch of sick calls that were thrown away. Id. Pierre told him to stop lying and left. Id. A few minutes later, Nurse Griswell arrived, plaintiff asked Griswell if he had given her at least 5 sick call requests when she came by to do cell checks on the Gray Unit, and Griswell confirmed to Pierre that plaintiff had done so and that Griswell had turned in all such sick call requests. Id. at 13.

On August 17, 2023, plaintiff completed for mailing his initial complaint in this action, but he had not yet heard about the X-ray results, and his back, chest, and left thigh still hurt. Id.

Defendants Parker and Dillard "were the faculty investigators for the grievance [he] filed on 5-15-2023," but they "refused to interview all the people [he] mentioned in the grievance," and they also refused to give plaintiff copies of their responses. Id.

8

On January 5, 2024, plaintiff filed a grievance "because [he] still hadn't been seen for the sick call from 8-29-23" and had been waiting for "Ford to see [him] for over 4 months." Id.

On January 9, 2024, plaintiff was seen by a different provider, Ms. Wyatt, who ordered X-rays and lab work that "came back positive for [an] autoimmune condition." Id.

For relief, plaintiff seeks, *inter alia*, monetary damages. Id. at 14.

Discussion:

These Eighth Amendment claims are not clearly frivolous as to Dr. Evans, Pierre, Wilson, Clark, Lowery, and Ford. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff, however, fails to plausibly allege viable Eighth Amendment claims against the remaining defendants. See Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level").

Finally, although plaintiff alleges that defendants violated his Fourteenth Amendment rights by interfering with the grievance process, prisoners do not have any constitutional right or due process interest in a grievance procedure. See Adams, 40 F.3d at 75 ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."); Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017) ("*Adams* establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process, for example.").

Conclusion:

In sum, the court: DENIES plaintiff's motion for reconsideration [D.E. 14]; DISMISSES

plaintiff's Fourteenth Amendment claims; DISMISSES WITHOUT PREJUDICE Griswell, Bond,

Parker, and Dillard as defendants; ALLOWS plaintiff's Eighth Amendment claims to proceed

against Dr. Evans, Pierre, Wilson, Clark, Lowry, and Ford; DIRECTS the clerk to continue

management of the action under Standing Order 14-SO-02; and, if service under the standing order

fails, further DIRECTS the U.S. Marshals Service to make service under 28 U.S.C. § 1915(d).

SO ORDERED this 20th day of May, 2024.

RICHARD E. MYERS II
Chief United States District Judge

10